Good morning, sir. You may proceed. Thank you, your honor, and may it please the court, John Sauer appearing on behalf of the appellants, the state defendants in this particular case. No injunction should have been entered in this case, and in fact, the entire case should have been dismissed for lack of jurisdiction because no plaintiff had Article III standing to challenge the ASC requirements at the time the lawsuit was filed, and no plaintiff had a redressable claim against the hospital privileges requirement at the time the lawsuit was filed. And I'd like to walk through the entities and the facilities they're seeking to operate as to both of the two challenges that are brought here, a challenge to the ASC requirements and a challenge to the hospital privileges requirement. First, there's the St. Louis-based organization, Reproductive Health Services, RHS, which seeks to operate facilities in Springfield and Joplin, but it is undisputed that prior to filing suit in this case, RHS never applied for an available deviation from the ASC requirements. The evidence is very clear that a deviation process is available, it's set forth in the regulation, it is an effective deviation procedure. In fact, there's no evidence that the state has ever failed to grant a deviation to a facility that wanted to, that sought a deviation in a way that prevented it from operating and performing abortions. But RHS never had recourse to that particular deviation procedure, therefore, the extent whether and to what extent the ASC requirements stop them from being able to operate those is speculation, until they actually go through that deviation procedure. As the district court found in the Drummond litigation 10 years ago, crediting the department's testimony that there is an available deviation procedure, it's a collaborative process, and a meaningful opportunity exists to pursue deviations. So RHS has no Article III standing to challenge the ASC requirements, because to the extent it's injured by the ASC requirements is a matter of conjecture, speculation, and it's hypothetical. Because RHS has no injury in fact to challenge the ASC requirements, it's separate challenge to the hospital privileges requirement is not redressable, because they consistently pled and insisted in the district court that they needed relief of some kind from both sets of requirements in order to start operating these facilities in Springfield and Choplin. But numerous cases, all cited in our brief, have said it again and again, we've got two to only one of them. Your challenge to the other one is not redressable. That is a core application of Article III's requirement of redressability. So RHS, therefore, lacked Article III standing to challenge the ASC requirements, lacked any showing of redressability, could not possibly make any showing of redressability as to the hospital privileges requirement at the time the lawsuit was fired, and therefore lacked standing completely. There were no Article III case or controversy to be considered on November 28, 2016, as to RHS when this particular lawsuit was filed. Now, I would turn now to the Kansas City-based entity, Comprehensive Health, which is seeking to operate facilities in Kansas City and Columbia. When the lawsuit was filed, Comprehensive Health had been a party to a binding settlement agreement stipulating exactly how the ASC requirements would apply to its facilities in Kansas City and Columbia for 10 years. In the lower court, they took the position that that settlement agreement was unenforceable because all the underlying regulations had been called into question by the Hellerstedt decision from 2016. But as we pointed out in the brief, it is the universal rule in American courts that a favorable change in the law does not excuse a party from its obligations to comply with the settlement agreement. So now on appeal, as I understand it, they now concede that the settlement agreement is binding and enforceable. And in fact, they said twice in their brief on appeal that Comprehensive Health, quote, needs no relief from the ASC requirements as to the Kansas City facility or the Columbia facility. But of course, if you concede that you need no relief from a regulation, you are conceding that you are not injured by that regulation and therefore have no Article III standing to challenge that regulation. So I think it's in light of the settlement agreement and in light of what I take the concession on appeal that they need no relief from the ASC requirements because of the settlement agreement. There's clearly no Article III standing on the part of Comprehensive Health to challenge the ASC requirements. So the only question remaining is, did Comprehensive Health have standing, did it have a redressability problem as to the hospital privileges requirement that it challenged as to its Kansas City and its Columbia facility? As to the Kansas City facility, it clearly does not, it cannot bring that challenge because there's an express stipulation in the settlement agreement is exactly how the hospital privileges requirement will apply to the Kansas City facility going forward. And actually, as of today, it's in compliance with that particular provision of the settlement agreement. So the Kansas City facility is operating and has achieved a license independent of any relief obtained from the district court in this case. So there's clearly no basis for Comprehensive Health to bring a challenge to the hospital privileges requirement as to the Kansas City facility. The only remaining question is, did Comprehensive Health assert a redressable challenge to the hospital privileges requirement as to the Columbia facility? Because the settlement agreement stipulates exactly how the hospital privileges requirement will apply to the Kansas City facility, but it's silent on how it applies as to the Columbia facility. I would argue that that silence indicates that that requirement is left fully in effect and that that has been negotiated and stipulated by the parties in that particular settlement agreement. But the court doesn't need to rely on that ground because the record contains a very clear independent basis why that Columbia facility could not have obtained a license the day that this lawsuit was filed and actually on an ongoing basis after that. Because at page 101 of the joint appendix, there is the deficiency letter that the department sent to Comprehensive Health as to the Columbia facility detailing at least six independent reasons why at the time this lawsuit was filed, that facility could not obtain a license. Even if it obtained complete relief from the hospital privileges requirement, there were at least six different reasons. Some of them very substantial, why that facility was in no position to obtain a license. Some of them, it failed to have an appropriate infection control procedure. It failed to have a quality assurance program. It had no agreements in place to assure that it could comply with the fetal tissue disposal requirements of Missouri law. It had two problems with its physical facilities and one of them, the department offered to Comprehensive Health, you may seek a variance from this, this recliner issue. The letter actually says, you know, you're out of compliance with what you stipulated to in the settlement agreement as a number of recliners in your facility and we invite you to apply for a variance on this, but at this time you don't have one. Comprehensive Health never corrected those deficiencies before filing suit and it never sought a deviation from any of those to allow it to comply with any of those deficiencies had it needed one, which it probably didn't because it's now saying it needs no relief from those particular requirements. On the contrary, Joint Appendix page 103 is the letter their counsel sent back on November 11th, two weeks before filing suit, conceding that there were deficiencies in the Columbia facility that would bar licensing them, but claiming that those are minor facilities and saying, it would be a waste of our time to correct these deficiencies that bar licensure until we get relief from the hospital privileges requirement and of course that position turns Article 3 on its head. The cases we cite, I would actually direct the court's attention to the Davis against FEC case that's cited in our brief from the U.S. Supreme Court that emphasizes that a plaintiff must have independent Article 3 standing to challenge each one of the regulations that it wants to challenge. So on November 28th, 2016, there's undisputed evidence in the record. At that time, there were independent reasons why the Columbia facility could not obtain an abortion license and therefore their challenge to the hospital privileges requirement was not redressable at that time. So if you analyze the four facilities and the two particular entities at stake here, carefully and look at them, the record is demonstrably clear that neither of these two plaintiffs had Article 3 standing to challenge either of these two provisions. The district court erred in granting a preliminary injunction because the district court lacked jurisdiction over the whole case and should have granted the state's motion to dismiss raising virtually these very arguments before it ruled on the preliminary injunction. And indeed, we incorporated these arguments by reference in our briefing on the preliminary injunction case. So for those reasons, this court should reverse the district court's order granting a preliminary injunction and write an opinion that makes it abundantly clear that there was no jurisdiction for this district court to act at all because no plaintiff had Article 3 standing to challenge either of the two sets of requirements that were at issue in this case. But even if the court were to reach the sort of preliminary injunction's treatments of the merits, the injunction would still have to be reversed and at the very least the case would have to be sent back to the district court because the district court committed a clear error of law in this case by categorically refusing to consider the state's evidence on two critical disputed factual issues. The question of what is the actual physical risks or safety of abortion procedures in the state of Missouri? And secondly, whether and to what extent these two sets of regulations actually promote women's health and safety by addressing those physical risk problems. We presented, there was voluminous evidence presented all in written form. There was no evidential hearing in this case. But I think 14 expert affidavits submitted by the parties, dozens of journal articles, much of it went to these two disputed factual issues. The district court, at the urging of the plaintiffs, concluded as a matter of law that he need not and could not consider that evidence because of the Supreme Court's decision in Hellerstedt. That was an error of law. We've cited the Carlin against Faust case from the 7th Circuit that addresses virtually this very particular, this very situation where plaintiffs wanted to challenge a 24-hour waiting period in Wisconsin after Casey had been decided upholding a 24-hour waiting period in Pennsylvania. And the state in that case said, well, look, they don't get to put in evidence or re-litigate the validity of a 24-hour waiting period because those are okay after the decision at Casey. And the 7th Circuit said no. Casey, every justice of the Supreme Court in the Casey decision agreed that courts considering challenges to similar provisions in other states in the future should engage in an individualized factual inquiry. In other words, the mere fact that the Supreme Court has made a determination as to a similar provision in another state does not absolve, does not take away the duty of the district judge to weigh the evidence to make, in this court's words in the Jigley case, concrete factual findings supporting its execution of the balancing required by Casey and by Hellerstedt. And in fact, I just want to direct the court's attention to what the Carlin panel said. They said, this is the only conclusion that would give Wisconsin women a fair shake because not all states are like Pennsylvania. And that is even more true here. Allowing the state to put on evidence and to make its case to a district court is absolutely imperative because Missouri is not like Texas. It's geographically very different than Texas, and the case we have put forward, the evidence we put forward includes voluminous, critical evidence that was not put forward in the Texas case. I cannot emphasize enough that in the Texas district court decision, there was an affirmative finding that Texas failed to put on any credible evidence to rebut the plaintiff's case. And that finding was reiterated by the majority opinion of the Supreme Court in Hellerstedt. Missouri cannot and should not be bound by whatever litigation decisions Texas made in the prior court. We are entitled to present our own evidence and make our own case. Unless the court has other questions at this time, I'll reserve the balance of my time. Very well. Thank you. Ms. Cohen, good morning. Good morning, Your Honors. You may proceed. May it please the Court, Melissa Cohen on behalf of plaintiff's appellees. The narrow preliminary injunction, which is on all fours with the Supreme Court's decision in Whole Woman's Health v. Hellerstedt, is clearly not an abuse of discretion and should be affirmed. The restrictions at issue in this case are virtually identical to the restrictions that were struck down by the Supreme Court in Whole Woman's Health. First, Missouri's hospital relationship restriction, just like the restriction in Texas, requires physicians to hold hospital privileges within a very tight geographical radius around a health center. Similarly, Missouri's ambulatory surgical center restriction, just like the Texas restriction struck down in Whole Woman's Health, requires that abortion providers meet specific physical facility standards like minimum corridor widths, minimum procedure room sizes, and the like. The Supreme Court held that neither of those restrictions advance women's health. First, as to the hospital relationship restriction, the Supreme Court recognized, and the record here shows, that even when rare complications from abortion occur, whether or not an abortion provider has a relationship with a local hospital does not affect the quality of care that patients receive. That's because the vast majority of complications can be treated with a return visit to an outpatient health center, and in the exceedingly rare case that a complication requires hospital treatment, plaintiff's protocols ensure continuity of care, and hospital-based physicians and on-call OBGYNs are able to provide high-quality care. As the Supreme Court found, a hospital privileges requirement also can't possibly affect patient care because it's entirely impractical. The vast majority of abortion complications, as the Supreme Court explained, do not arise until after a patient has left a health center and gone home. And so in the rare event that a patient seeks care at a hospital, she'll seek care as she should at the hospital nearest to her home, and not at the hospital where the physician has privileges. Turning to the ambulatory surgical center restriction, as the Supreme Court recognized, and as the record in this case shows, abortion can be safely provided in outpatient settings similar to a doctor's office, and this is standard practice throughout the country and consistent with the guidance of the American College of Obstetricians and Gynecologists. The Supreme Court specifically found that providing abortions in an ambulatory surgical center will not improve patient outcomes. Defendants' only substantive argument in defense of the ambulatory surgical center restriction has been the false claim that surgical abortion raises the same health and safety concerns as other general surgeries. But the record is clear that surgical abortion does not involve an incision or an entry into a sterile body cavity, and only involves local anesthesia or moderate sedation. And the Supreme Court pointed to precisely those facts in finding the ambulatory surgical center restriction to be unnecessary. Turning to the other side of the whole women's health balancing test, which requires us to look at the burdens of the restrictions. The burdens of the Missouri restrictions are even more profound than the burdens the Supreme Court found in Texas, and they're very similar burdens. The record is 100% clear that prior to the preliminary injunction, Missouri's restrictions for years limited a state of nearly 70,000 square miles and that has a population of over 6 million people to only one abortion provider located at the far eastern edge of the state. Just like the Supreme Court found in Texas, Missouri's restrictions are preventing the to provide abortions from doing so, and as a result, women are forced to travel very long distances to reach that one St. Louis provider. And in Missouri, those travel burdens are even more extreme than in Texas, because in Texas women only have to make the trip once, whereas in Missouri they have to make the trip twice. And the distances in Missouri are even longer than the distances the Supreme Court discussed in Texas. The Supreme Court in Missouri also talked about a variety of additional burdens. For example, the fact that women were prevented from seeking care in their home communities at smaller health centers, and they said that was a burden to women. The same exact problem exists here. So it's very clear that in this case where we have the same restrictions that were at the district court's preliminary injunction, the district court did not abuse its discretion in finding a likelihood of success on the merits given the guidance we have in Whole Women's Health and given the facts in the record here. I do want to briefly touch, before I turn to the jurisdictional issues, on this court's recent decision in Jigley. In the state's reply brief, they talked about the Jigley decision, and I just want to point out that the Jigley decision does not stand for the proposition that we ignore the Supreme Court's decision in Whole Women's Health. The district court here followed Whole Women's Health, as has every other court, to consider ambulatory surgical center and privileges restrictions. And in fact, those restrictions have fallen in at least five other states after Texas, including, for example, Mississippi, Louisiana, and Alabama. Whole Women's Health did not require the sort of numerical estimates of the women affected by abortion restrictions that Jigley would require when faced with a situation of overwhelming burden in the state where restrictions would shut down the majority of health centers and force women to travel these very long distances. Instead, the Supreme Court in Whole Women's Health based its undue burden holding on the burdens that I've already articulated, the fact that the restrictions were shutting down the majority of health centers, forcing women to travel long distances, preventing them from obtaining care at small facilities in their local communities, et cetera. And the court, the district court here, did the exact same thing. It found that the four facilities that plaintiffs seek to operate are being prevented from doing so by the restrictions. And as a result, women in the Columbia area, the Springfield area, the Kansas City area, and the Joplin area, all are unable to access care in their home communities. The district court also talked about other similar burdens to Texas, for example, that the Missouri 72-hour waiting period was compounding the burdens on women. The district court also talked about the fact that when safe and legal abortions provided by medical professionals are unavailable, that that creates actually health hazards for women. And so in this situation where we have such a similar burden situation to Whole Women's Health, the district court did not abuse its discretion in finding similar burdens here. I also want to note that it's very important that we're talking about a preliminary injunction here. And so given Whole Woman's Health and given the record here, the record more than adequately supports the conclusion of likelihood of success on the merits in this case. So even if this court would ultimately hold that juggling on the merits would require the district court to make numerical estimates of the number of women affected, that certainly should not be required for plaintiffs to show mere likelihood of success when we have Whole Woman's Health as such direct and binding guidance as to these particular restrictions. I'd like to turn to some of the jurisdictional arguments raised by Mr. Sauer. First on this issue of waivers and the waiver process that exists for a portion of the ambulatory surgical center requirements. The district court properly found that the claim that was pled in this case, in the complaint, which was a claim that the entire ambulatory surgical center scheme as applied to plaintiffs was unconstitutional, which is the same claim that was raised in Whole Woman's Health and the Supreme Court did find that the application of the scheme in its entirety was unconstitutional. And the waiver process does nothing to affect the ripeness of that particular claim. Even if there were a workable waiver process here, which I'll address momentarily, if plaintiffs had gone through that process, that would have nothing to do with the claim that was pled, which is, are plaintiffs required to be swept into this ambulatory surgical center scheme following Whole Woman's Health? And so that claim was certainly ripe. And the state's argument that that ripeness problem then created a redressability problem for the privileges argument hinges entirely on that waiver issue. And as I've just explained, that's just not, that argument just fails. I also want to touch on the settlement agreement that was entered in the Drummond litigation. Importantly, Plaintiff RHS was not a party to that litigation. And so even if Mr. Sauer were correct that that settlement prevented Plaintiff Comprehensive Health from having standing in this case, it certainly does not prevent Plaintiff RHS from having standing. And the case law is completely clear that once one plaintiff has been found to have standing, the court need not reach the standing of the remaining parties. And so the settlement agreement issue is just not one that this court needs to deal with. Mr. Sauer also discussed the idea that Plaintiff Comprehensive Health doesn't need relief from the ambulatory surgical center restriction any longer. I would submit that given the history here, that's just not the case. For example, Mr. Sauer talked about the Kansas City Health Center and said that it is now in compliance with the restrictions. That's true, but it was in compliance with the restrictions in January of 2017 and alerted the Department of Health to that fact. But the Department of Health wouldn't even talk to them and didn't issue a license until September of 2017 after the preliminary injunction was issued. So it's clear that the court intervention here is what really finally got that process moving along. I also want to talk about this argument Mr. Sauer made that there's no redressability for Comprehensive Health on the privileges issue because of small deficiencies in inspections that occurred in the fall. Again, the claim that was pled here is redressable as to those small deficiencies don't affect the redressability of the pleaded claims. In terms of the Ambulatory Surgical Center restriction, again, the pleaded claim was to be removed from the scheme in its entirety. And so those small deficiencies that were easily corrected have already been corrected and those facilities have been licensed, didn't affect that original claim. And as to the privileges question, Mr. Sauer said that those deficiencies would prevent the facilities from getting a license and so the privileges claim was not redressable. I'm a little confused where he's going with that because the issues were part of the Ambulatory Surgical Center restriction. So I don't really see how those connect, but nonetheless, those deficiencies have been corrected and those licenses have been issued. I also want to briefly talk about the District Court's consideration of the evidence in this case. The state insists that the District Court just ignored its evidence, but that's just not true. The District Court permitted voluminous evidence to be submitted, multiple expert declarations, discovery both to plaintiffs and to third parties, and the District Court said that it considered the evidence to the extent appropriate, but that the evidence could not support a departure from whole woman's health. And that is completely consistent with the Supreme Court's law and the law of this circuit about how to apply these sorts of Supreme Court holdings. Mr. Sauer, presumably because the law in the 8th Circuit is so clear on this issue, tries to rely on the 7th Circuit Carlin case. But this court's law here in this circuit is very clear on how this should work and there's a very helpful excerpt actually from this court's decision in Carhartt v. Gonzales which I would point the court to. That's at 413 F. 3rd, 791 beginning at page 799. This court talks about different kinds of fact-finding that courts can do. It talks about adjudicative versus legislative facts and explains that legislative facts are those that have ceilings beyond the specific parties to the suit. And says that the medical necessity of particular abortion procedures, which was at issue there, clearly falls into this latter category as such procedures are either sometimes medically necessary or they're not. The answer to this question does not vary from place to place or from party to party. And that's the very same sort of issue here. The safety of abortion and whether these particular restrictions benefit patients or make abortions safer are legislative facts that don't vary from place to place and party to party. And the court here in Carhartt went on to say if the issue is one of legislative fact, it's unsound to say that on records similar in nature, a law could be valid in one state and invalid in another. And what Mr. Sauer did not touch on is the content of the record here. The content of the record here shows that the facts in Missouri are just the same as the facts in Whole Woman's Health. Just to take one example on the safety of abortion, the Whole Woman's Health Court relied upon a study that found that the overall complication rate from abortion is 2.1%. And that is a study that actually was relied upon by the state's experts below. The evidence in this case shows that the overall complication rate from abortions in Missouri is 0.91%. It's a lower rate than what existed in what the Supreme Court relied upon in Texas. The state also presented no evidence to show that either restriction either reduces the And so there's simply no basis in this record to depart from the Supreme Court's holdings. I see my time's run out, so I would just ask that... For my benefit, if for no one else's, again, your specific response to the Article 3 standing deficiency is that you have standing. RHS as to Kansas City? RHS is the St. Louis-based plaintiff that seeks to open the facilities in Springfield and Joplin. Oh, yeah. Okay. But to what extent are any of these claims... To what extent are any of the... Do any of the claims suffer from a lack of Article 3 standing? Your Honor, as I've said, I don't think any of the claims suffer from a lack of standing. The state's principal arguments on that are the waiver issue and the settlement agreement issue. And as I've explained, the waiver issue is not... The state's not looking at this correctly in that the pleaded claim was about the ambulatory surgical center restriction as a whole. The district court, in its equitable discretion, crafted a much narrower preliminary injunction that goes to only the physical facility requirements of that scheme. But the pleaded claim, which of course is what establishes standing, was as to the overall scheme. And then a final question from me would be, if we affirm, then what happens? What goes on after... If we were to affirm the district court's preliminary injunction, then what happens next? So the merits of this case have been stated in the district court pending the outcome of this appeal. So if this court affirmed, then the case would go back to the district court and it would proceed forward on the merits to a final resolution. Well, thank you for clarifying those things for me. Sure. Sure. If there are no further questions... Thank you for your argument. Thank you very much. And we'll hear from the state in rebuttal. Or Mr. Hawley's counsel. Thank you, Your Honor. And Judge Wilman, I'd like to start by addressing that last point, if I may. I understand the plaintiff's position to be that because they brought a facial challenge to the entire set of ASC regulations, they were not required to ripen their challenge to the ASC regulations by seeking an available deviation before they filed suit. And I think that that is directly contrary to governing U.S. Supreme Court case law. Because we quoted in our brief, the SUDM case, for example, the Supreme Court's... Again? What case? I know it's in your brief. SUDM. S-U-D-M. S-U-I-T-U-M. Okay. Where a regulatory regime offers the possibility of a variance, a party seeking to challenge that regime must actually seek a variance in order to ripen their claims. Similarly, in the HODEL case, H-O-D-E-L, the Supreme Court said, if the parties go through the variance process, a mutually acceptable solution might well be reached, obviating some or all of the constitutional dispute. And that's why this requirement is repeatedly asserted by the Federal Courts of Appeals and the U.S. Supreme Court. Because if, for example, RHS had gone through the deviation process and obtained a deviation that allowed its physical facilities in Springfield and Joplin to operate, a great deal of this constitutional controversy would never have come before the courts. So there is this... Had gone through it, then what would happen? If they went through it and they received a deviation that allowed them to operate those facilities, as every abortion facility who's applied for a deviation has done, they have all received such a deviation that allowed them to operate, there would be no constitutional dispute over the ASC requirements at all. And so the question of whether or not those ASC requirements are blocking RHS from operating in Springfield and Joplin is a hypothetical and speculative question until they go through the deviation process. And so I would... That goes to the very first... Can you assert on behalf of your client that if they apply, they will be granted these waivers or compliance? We cannot know that because we have no idea what those physical facilities look like. But what the evidence that is before the court is evidence of how the deviation process has happened in the past. And I would point out to the Columbia facility for... Go ahead, Your Honor. I apologize. Oh, no, no. You say there have been cases in the record that establish that variances have been given or compliance? Exactly right. There are three instances in which deviations were given. For example, in the settlement agreement, the Kansas City facility received a complete deviation from all of the physical plant requirements of the entire regulatory section because it was doing only medication abortions in Kansas City. Columbia was doing surgical abortions. And what happened was the department in 2010 agreed to waive the vast majority of the sort of more burdensome requirements that would have required new constructions in exchange for certain concessions and improvements to that physical facility that were material to patient safety. So that is what the evidence... So the position is none of this litigation would have been necessary had they done that which the statutes permit them to do? Certainly some, if not all, of the constitutional dispute might have been obviated if they had pursued the deviation process. Certainly all of it has to do with the assay requirements. Was it Samuel Taylor Coleridge who coined the phrase, a willing suspension of disbelief? Should we willingly suspend our disbelief? I would direct the court's attention to this court's cases that say the court should presume that the state officials, the department, would act in good faith in going through that deviation process. And that's exactly what the Drummond case did. The Drummond case in 2007 when there was the first trial... He actually says things in his opinion that address that. He says, well, there's political pressure on state officials from the opponents of abortion that might influence this outcome. I think it was totally improper as a matter of law for him to conclude that... Even though it may have been correct as a matter of fact. There's certainly no evidence submitted to... There's no evidence that he could have made a factual determination on that basis. I read the newspapers just like he does. But anyway, we thank you for your argument. Thank you, Your Honor. The case is submitted and we'll go on to the next case after we take about a 10 to 15 minute recess.